Case 2:13-cv-00036-JES-DNF   Document 160   Filed 10/31/14   Page 1 of 17 PageID 3469

```
                    UNITED STATES DISTRICT COURT
                     MIDDLE DISTRICT OF FLORIDA
                        FORT MYERS DIVISION
```

PAMELA M. PERRY,

       Plaintiff,

v.                                    Case No: 2:13-cv-36-FtM-29DNF

THE SCHUMACHER GROUP OF LOUISIANA, a Louisiana corporation, THE SCHUMACHER GROUP OF FLORIDA, INC., a Florida corporation, COLLIER EMERGENCY GROUP, LLC, a Florida limited liability company, HEALTH MANAGEMENT ASSOCIATES INC., a Michigan corporation, and NAPLES HMA, LLC, a Florida limited liability company,

       Defendants.

_____

**OPINION AND ORDER**

     This matter comes before the Court on the Schumacher Group of Louisiana, Inc., the Schumacher Group of Florida, Inc., and the Collier Emergency Group, LLC's Motion for Summary Judgment (Doc. #87) filed on June 12, 2014.  Plaintiff filed a Response (Doc. #110) on July 23, 2014, and defendants filed a Reply (Doc. #133) on August 27, 2014.  Also before the Court is the Collier Emergency Group, LLC's Motion for Summary Judgment on Cross-Complaint (Doc. #99) filed on July 1, 2014.  Naples HMA, LLC filed an Opposition

to the Collier Emergency Group, LLC's Motion for Summary Judgment on Cross-Complaint (Doc. #132) on August 26, 2014.

**I.**

The Schumacher Group (TSG) is a corporation that provides healthcare staffing services at medical facilities in certain states throughout the country.[1]  On May 19, 2011, the Collier Emergency Group, LLC (CEG), a subdivision of TSG, entered into an Exclusive Agreement for Emergency Medical Services (Exclusive Agreement) with Naples HMA, LLC (HMA) to staff the emergency departments at two hospitals under the Physician's Regional Healthcare System: Physician's Regional - Pine Ridge (Pine Ridge) and Physician's Regional - Collier Boulevard (Collier).  (Doc. #87-1.)  Under the terms of the Exclusive Agreement, CEG was required to staff the emergency department with an adequate number of emergency professionals and designate a physician, reasonably satisfactory to HMA, to be the Medical Director of the Emergency Department.  (Id. at 7.)  The agreement further provided that all emergency professional were subject to the "continuous approval" of HMA, and that HMA may, without cause, direct CEG to preclude any emergency professional from providing medical services if HMA reasonably believes that the continued provision of medical

---

[1] TSG consists of the Schumacher Group of Louisiana, Inc., the Schumacher Group of Florida, Inc., and the Collier Emergency Group, LLC.

services is not in its "best interest." (Id. at 8.) If such a directive was made, CEG was contractually required "within 30 days of [HMA's] directive, [to] exclude that Emergency Professional from providing any further Services." (Id.)

In June 2011, plaintiff Pamela Perry, M.D. (Dr. Perry or plaintiff), an African American female and emergency physician, was recruited by CEG to serve as the Medical Director in the Emergency Department at Pine Ridge. HMA approved of CEG's selection and Dr. Perry was subsequently offered the position. (Doc. #87, p. 5; Doc. #111, p. 1.) Dr. Perry accepted the position and entered into three separate agreements with CEG on June 23, 2011: a Business Associate Agreement, a Physician Agreement, and a Medical Director Agreement.

Dr. Perry's tenure as Medical Director at Pine Ridge began in July 2011. The satisfaction ratings for the Emergency Department steadily increased under her supervision, but the improvements were not without complications. Plaintiff testified that Carol McConn (McConn), HMA's chief nursing officer, ignored her, excluded her from meetings, and bypassed her in communications. (Doc. #90, pp. 30, 36.) Plaintiff also stated that McConn rarely spoke with her, but routinely spoke with her predecessor and "any male physician present." (Id. at 30.)

Similarly, problems with HMA nursing director Bobbie Hamilton (Hamilton) began on "day one." (Id.) Hamilton refused to discuss

the business of the Emergency Department with Dr. Perry, ignored her as Medical Director, and "regularly exhibited a pattern of behavior consistent with harassment and being an obstructionist to [plaintiff's] role as Medical Director such as failing to address clinical issues by HMA RN's working with [her] and failing to communicate resolution of these concerns to [her]. She [also] refused to comply with requests for weekly meetings to ensure a collaborative approach to emergency department management." (Doc. #90, p. 73; Doc. #87-6, p. 16.)

On January 11, 2012, Dr. Perry sent an email to Hamilton and Dr. Todd Carlson (Dr. Carlson), TSG's Regional President-East Division, regarding the overtly negative attitude that nurse Aimee Collins (Collins) exhibited towards plaintiff. (Id. at 90.) Dr. Perry also stated that HMA nurse Jacki Ellis (Ellis) treated her disrespectfully and unfairly by "lying in a medical record, refusing to be professional towards [her] in any manner, acting rude, confrontational and directly contradictory with regards to patient care. Ms. Ellis did not exhibit similar behavior towards other MD's." (Doc. #87-4, p. 8.) Plaintiff believed that the negative behavior exhibited by McConn, Hamilton, Collins, and Ellis was racially motivated.

In March 2012, Dr. Carlson and Marty Anderson (Anderson), a Senior Regional Vice President at TSG, had a meeting with Joseph Bernard (Bernard), the chief operating officer at Pine Ridge,

4

McConn, and Kathleen Bove (Bove), HMA's assistant chief nursing officer. During the meeting, McConn informed those present of issues regarding plaintiff's communications with nurses, her alleged failure to complete mandatory chart reviews, and her alleged noncompliance with the HMA sedation policy. (Doc. #89, p. 6; Doc. #90, pp. 52-54.) Dr. Carlson, Anderson, and Bernard did not know of any issues regarding Dr. Perry's performance prior to this meeting. (Doc. #89, p. 4; Doc. #110-1, p. 16; Doc. #128, p. 36.)

On or about March 7, 2012, Dr. Perry had dinner with Dr. Carlson and Anderson to discuss the issues raised by McConn. Dr. Perry indicated that the alleged deficiencies in her performance were false and that she would provide Dr. Carlson and Anderson with documentation to support her position. Dr. Perry also agreed to provide Dr. Carlson and Anderson with an opportunity to address these issues with HMA. On March 21, 2012, Dr. Carlson sent Dr. Perry a text message stating that "We will be clearing the air and bringing the facts to light in front of all admin. Will take care of it." (Doc. #87-8.)

On March 22, 2012, Dr. Perry told Anderson that she believed racial discrimination was an issue at Pine Ridge. (Doc. #90, p. 82.) In response to plaintiff's allegations of racial discrimination, Anderson sent Dr. Perry an email stating:

5

> I'm still bothered about your comments that Bobbie [Hamilton] has been making derogatory racial comments about you. I know that you promised not to give us the names, but I really feel that it's necessary to bring this forward, it absolutely cannot be tolerated and I feel strongly and we need to have this investigated and handled. Would you reconsider? There should be no threat to the parties that either heard the comments or were told the comments. They would be protected.

(Doc. #61-2, p. 19.) Plaintiff refused Anderson's request, stating "Unfortunately, I am simply not in a position to provide that specific info." (Id. at p. 18.)

On or about March 28, 2012, Bernard requested that Dr. Perry be removed as Medical Director and staff physician by invoking the contractual provision permitting HMA to remove a service provider for no cause if it believed that the provider's services were not in Pine Ridge's best interest. Dr. Carlson and Anderson agreed to honor the request and provided Dr. Perry with the sixty days' notice required by the Physician Agreement and the Medical Director Agreement. Dr. Perry worked at Pine Ridge until May 22, 2012.

Plaintiff initiated this action on January 23, 2012, by filing a Complaint against TSG, CEG, and HMA. (Doc. #1.) Plaintiff is proceeding on her Fourth Amended Complaint, filed August 25, 2013, which alleges that defendants unlawfully discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964 (Title VII) and 42 U.S.C. § 1981. Plaintiff also asserts a claim for trade libel against HMA. (Doc. #61.)

6

**II.**

Summary judgment is appropriate only when the Court is satisfied that "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." Baby Buddies, Inc. v. Toys "R" Us, Inc., 611 F.3d 1308, 1314 (11th Cir. 2010). A fact is "material" if it may affect the outcome of the suit under governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "A court must decide 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Hickson Corp. v. N. Crossarm Co., Inc., 357 F.3d 1256, 1260 (11th Cir. 2004) (citing Anderson, 477 U.S. at 251).

In ruling on a motion for summary judgment, the Court views all evidence and draws all reasonable inferences in favor of the non-moving party. Scott v. Harris, 550 U.S. 372, 380 (2007); Tana v. Dantanna's, 611 F.3d 767, 772 (11th Cir. 2010). However, "if reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." St. Charles Foods, Inc. v. America's Favorite Chicken Co., 198 F.3d 815, 819 (11th Cir. 1999) (quoting Warrior Tombigbee Transp. Co. v. M/V Nan Fung, 695 F.2d 1294, 1296-97 (11th Cir. 1983)

(finding summary judgment "may be inappropriate where the parties agree on the basic facts, but disagree about the factual inferences that should be drawn from these facts")). "If a reasonable fact finder evaluating the evidence could draw more than one inference from the facts, and if that inference introduces a genuine issue of material fact, then the court should not grant summary judgment." Allen v. Bd. of Pub. Educ., 495 F.3d 1306, 1315 (11th Cir. 2007).

### III.

TSG contends it is entitled to summary judgment on plaintiff's race, gender, and retaliation claims because plaintiff was an independent contractor, not an employee. Title VII prohibits employers from discriminating against "any individual" with respect to the terms and conditions of employment "because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1).[2]  "[O]nly those plaintiffs who are 'employees' may bring a Title VII suit." Llampallas v. Mini-Circuits, Lab, Inc., 163 F.3d 1236, 1242 (11th Cir. 1998). To determine whether a plaintiff is an employee or an independent

---

[2]Section 1981 prohibits discrimination in the making and enforcing of contracts based on a person's race. 42 U.S.C. § 1981(a). "The same analysis applies to claims for employment discrimination brought under Title VII as to those brought under § 1981." Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 207 (11th Cir. 2008).

8

contractor, the Eleventh Circuit has adopted a hybrid economic realities test. Cobb v. Sun Papers, Inc., 673 F.2d 337, 340-41 (11th Cir. 1982). Under this test, the economic realities of the employment relationship must be viewed in light of common law principles of agency and the employer's right to control and direct the work of an employee. Id. at 341. See also Cuddeback v. Florida Bd. of Educ., 381 F.3d 1230, 1234 (11th Cir. 2004).

Among the common law factors considered in conducting this analysis are: (1) the intention of the parties; (2) the skill required in the particular occupation; (3) the party furnishing the equipment and the place of work; (4) the method of payment, whether by time or by job; (5) the type of employment benefits provided; (6) the manner in which the work relationship is terminated; i.e., by one or both parties, with or without notice and explanation; (7) the importance of the work performed as part of the business of the employer; and (8) the manner in which taxes on income are paid. Cobb, 673 F.2d at 341. In assessing the amount of control an employer exercises over the employee's work duties, courts look not only to the results that are to be achieved, but also the "manner and means by which the work is accomplished." Daughtrey v. Honeywell, 3 F.3d 1488, 1496 (11th Cir. 1993). "Consideration of all the circumstances surrounding the work relationship is essential, and no one factor is determinative. Nevertheless, the extent of the employer's right

9

to control the 'means and manner' of the worker's performance is the most important factor." Cobb, 673 F.2d at 340 (quoting Spirides v. Reinhardt, 613 F.2d 826, 831-32 (D.C. Cir. 1979)).

**A.    Common Law Factors**

Applying each of the common law principles to the situation at hand, the Court finds that plaintiff was an independent contractor.

**(1)  The Parties' Intent**

The undisputed evidence in this matter shows that the unmistakable intention of parties was for Dr. Perry to operate as independent contractor. Dr. Perry executed a Physician Agreement and a Medical Director Agreement when she was hired by CEG. The Physician Agreement provided that Dr. Perry's relationship to CEG "shall be that of an independent contractor" and that the agreement "shall not be construed as an agreement of employment, a partnership or any other form of business entity." (Doc. #87-2, p. 1.) The Medical Director Agreement also stated that Dr. Perry will be "acting as an independent contractor." (Doc. #87-3, p. 3.) Dr. Perry understood both of these agreements and believed that she was acting as an independent contractor. (Doc. #90, p. 55.) Accordingly, this factor favors an independent contractor relationship.

**(2) The Skill Required**

Plaintiff concedes that considerable skill is required to work as a medical director and physician, and that this factor weighs in favor of independent contractor status. (Doc. #110, p. 11.)

**(3) The Party Furnishing the Equipment and Place of Work**

Dr. Perry was required to supply items such as a lab coat and a stethoscope, but the rest of the equipment was to be supplied by Pine Ridge. (Doc. #87-2, p. 2.) This factor therefore favors employment status, but unremarkably so. In today's world, a physician, whether a full-fledged employee or an independent contractor, is no longer likely to carry all relevant medical instruments in a black satchel. Instead, the physician is expected to make full use of a hospital's facilities during the course of her services. See Tsosie v. United States, 452 F.3d 1161, 1164 (10th Cir. 2006).

**(4) The Method of Payment**

The Physician Agreement provided that CEG was to pay plaintiff an hourly rate for the shifts worked. Dr. Perry could also receive incentive compensation at the sole discretion of CEG. (Doc. #87-2, p. 5.) For the services provided as Medical Director, Dr. Perry received a monthly stipend of $8,000 and up to $2,000 in incentive compensation. (Doc. #87-3, p. 2.) Because plaintiff was paid by the hour and by the job, this factor favors neither employee nor

independent contractor status.  See Lockett v. Allstate Ins. Co., 364 F. Supp. 2d 1368, 1375 (M.D. Ga. 2005).

### (5) The Type of Employment Benefits Provided

Plaintiff did not receive any benefits that would commonly be associated with employment; thus, this factor does not support employee status.

### (6) The Method of Termination

The Physician Agreement and the Medical Director Agreement provided that either party could terminate the agreements without cause by "giving not less than sixty (60) days prior written notice to the other party specifying the date of termination."  (Doc. #87-2, p. 6; Doc. #87-3, p. 2.)  Because the agreements can be terminated by either party, the Court finds that this factor is indicative of an independent contractor relationship.  See Cont'l Cas., Co. v. Alabama Emergency Room Admin. Servs., P.C., 623 F. Supp. 2d 1290, 1301 (N.D. Ala. 2009) (finding that a contract provision allowing either party to terminate the agreement with thirty days' notice was an indicator of independent contractor status); Lockett, 364 F. Supp. 2d at 1374 (same).

### (7) The Importance of the Work to the Employer

The work provided by Dr. Perry was an integral part of CEG's business and is therefore indicative of employee status.

12

**(8) The Manner in Which Taxes Are Paid**

The final common law factor favors independent contractor status. A plaintiff is likely to be considered an employee if the employer deducts taxes from the plaintiff's paycheck. See Cobb, 673 F.3d at 341. Here, withholding taxes and any other statutory withholdings was the sole responsibility of Dr. Perry. (Doc. #87-2, p. 1; Doc. #87-3, p. 3; Doc. #90, p. 60.)

**B.   The Right to Control**

Next, the Court will address whether CEG had the right to control Dr. Perry. "If the employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, and employer/employee relationship is likely to exist." Cobb, 673 F.2d at 338 (quoting Spirides, 613 F.2d at 831-32). Here, the undisputed evidence establishes that CEG did not exercise sufficient control over Dr. Perry's day-to-day affairs to create an employer/employee relationship.

Dr. Perry argues that certain provisions of the Physician Agreement and the Medical Director agreement are indicative of CEG's right to control. The Court disagrees. The Physician Agreement provided that CEG was not to exercise any control or direction over the methods by which Dr. Perry performed her professional work and duties while on duty. (Doc. #87-2, p. 1.) Dr. Perry was to provide such medical services as determined by

13

and between Dr. Perry and Pine Ridge and at the times agreed upon by Dr. Perry and CEG.  (Id. at 2.)  If Dr. Perry was unable to provide services at the agreed upon time, she was to notify CEG immediately to coordinate a replacement, and, in the absence of a bona fide emergency, was required to pay CEG the actual cost of the replacing physician.  (Id. at 2-3.)  Dr. Perry was also required to use CEG for coding services.  (Id. at 5.)

The Medical Director Agreement also stated that CEG would not "exercise control or direction of the manner or method in which the Physician performs any medical services which may be the subject matter of this Agreement."  (Doc. #87-3, p. 2.)  Under the terms of the agreement, Dr. Perry was to substantially perform and carry out the typical duties of a dedicated, fully functional Medical Director.[3]  (Id. at 1.)  In her capacity as Medical Director, Dr. Perry was to act as a functional liaison between CEG and Pine Ridge and was to answer to the administrator at Pine Ridge.  (Id.)

Although Dr. Perry was required to work at agreed upon times and use CEG for coding services, the agreements explicitly stated that CEG was not to control the manner or method in which Dr. Perry performed her duties.  The Court finds that the terms of the

---

[3] An example of such duties was attached the Medical Director Agreement.  (Doc. #87-3, p. 1.)

Physician Agreement and the Medical Director Agreement do not establish that CEG controlled "the means and manner" of plaintiff's performance.  The Court will now turn to the actual conditions of plaintiff's employment.

When Dr. Perry started working at Pine Ridge, Dr. Carlson, her "direct supervisor," informed her that he wanted Dr. Perry to build the emergency department with the doctors she wanted working there.  (Doc. #90, p. 88.)  Dr. Carlson also told plaintiff that she would need to replace most, if not all, of the doctors in the emergency department.  (Id. at 89.)  While Dr. Perry argues that this suggests control, her testimony shows otherwise.  The testimony reveals that Dr. Perry did not agree with the changes urged by Dr. Carlson and that she "didn't fire any of the doctors." (Id.)  Plaintiff's ability to act in a manner contrary to the wishes of CEG is highly indicative of an independent contractor relationship.

Once CEG became aware of the issues raised by McConn, it urged Dr. Perry to meet with Hamilton.  Dr. Perry claims that she was ordered to attend the meetings with Hamilton, but testified that CEG requested weekly meeting between Dr. Perry and Hamilton and that she agreed to attend the meetings.  (Doc. #90, p. 90; Doc. #110-3, p. 8.)  This does not suggest control.

Finally, Dr. Perry argues that there is genuine issue of material fact as to her status because CEG served as a mentor and

15

supervised her work. Dr. Carlson and Anderson spoke to Dr. Perry about any issues or problems at Pine Ridge and would offer advice when appropriate. (Doc. #110-3, p. 6; Doc. #110-5, p. 5.) The advice and encouragement offered by CEG does not amount to control over the means and manner of Dr. Perry's work.

CEG also tracked and monitored the performance of Dr. Perry (Doc. 110-3, p. 6) as well as her downcode percentage (Doc. #110-5, p. 35; Doc. #110-6). The supervision exercised by CEG does not appear to be of how the work is done, but rather of the results achieved. This is "typical" of how an employer is likely to deal with an independent contractor. Cobb, 673 F.2d at 342.

The facts, when viewed in a light most favorable to plaintiff, lead the Court to conclude that plaintiff was an independent contractor. As such, plaintiff cannot maintain her claims against CEG. Accordingly, TSG's motion for summary judgment is granted.

**IV.**

On October 30, 2014, CEG withdrew its Motion for Summary Judgment on Cross-Complaint because the cross-complaints were voluntarily dismissed. (Doc. #157.) The Court will therefore consider the motion withdrawn.

Accordingly, it is now

**ORDERED:**

1. Defendant's the Schumacher Group of Louisiana, Inc., the Schumacher Group of Florida, Inc., and the Collier Emergency Group,

16

LLC's Motion for Summary Judgment (Doc. #87) is **GRANTED** and the Schumacher Group of Louisiana, Inc., the Schumacher Group of Florida, Inc., and the Collier Emergency Group, LLC are **dismissed with prejudice**.

2. The Collier Emergency Group, LLC's Motion for Summary Judgment on Cross-Complaint (Doc. #99) is deemed **withdrawn**.

3. The Clerk shall terminate defendants the Schumacher Group of Louisiana, Inc., the Schumacher Group of Florida, Inc., and the Collier Emergency Group, LLC on the docket, but withhold the entry of judgment until the conclusion of the case.

**DONE AND ORDERED** at Fort Myers, Florida, this __31st__ day of October, 2014.

_____
JOHN E. STEELE
UNITED STATES DISTRICT JUDGE


Copies:
Counsel of record