FILED

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## FORT MYERS DIVISION

14 NOV 19  AM II: 05

CLERK, U.S. DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FT. MYERS, FLORIDA

PAMELA M. PERRY,

    Plaintiff,

v.                                    Case No. 2:13-cv-36

NAPLES HMA, LLC, a Florida
limited liability company,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANT NAPLES HMA, LLC'S RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW (Docket No. 168) to which Plaintiff has responded (Docket No. 170). For the reasons set forth below, the Motion for Judgment as a Matter of Law is granted as to Counts I, II, IV and V and denied as to Count III.

### FACTUAL BACKGROUND

The background of this case was articulated in the Opinion and Order (Docket No. 160, at 2-6) granting The Schumacher Group's (TSG's) Motion for Summary Judgment (Docket No. 87).[1] The facts set out in that opinion are incorporated by reference, and additional facts relevant to the present motion are set out herein with reference to the issues to which they relate.

---

[1] TSG consists of the Schumacher Group of Louisiana, Inc., the Schumacher Group of Florida, Inc., and the Collier Emergency Group, LLC.

TSG is a corporation that provides healthcare staffing services at medical facilities in certain states throughout the country. On May 19, 2011, the Collier Emergency Group, LLC (CEG), a subdivision of TSG, entered into an Exclusive Agreement for Emergency Medical Services (Exclusive Agreement) with Naples HMA, LLC (Naples HMA) to staff the emergency departments at two hospitals under the Physician's Regional Healthcare System: Physician's Regional - Pine Ridge (Pine Ridge) and Physician's Regional - Collier Boulevard (Collier). (Docket No. 87-1.) Under the terms of the Exclusive Agreement, CEG was required to staff the emergency department with an adequate number of emergency professionals and designate a physician, reasonably satisfactory to Naples HMA, to be the Medical Director of the Emergency Department. (Id. at 7.) The agreement further provided that all emergency professionals were subject to the "continuous approval" of Naples HMA, and that Naples HMA may, without cause, direct CEG to preclude any emergency professional from providing medical services if Naples HMA reasonably believes that the continued provision of medical services is not in its "best interest." (Id. at 8.) If such a directive was made, CEG was contractually required "within 30 days of [Naples HMA's] directive, [to] exclude that Emergency Professional from providing any further Services." (Id.)

In June 2011, plaintiff Pamela Perry, M.D. (Perry or plaintiff), an African American female and emergency physician, was recruited by CEG to serve as the Medical Director in the Emergency Department at Pine Ridge. Naples HMA approved of CEG's selection and Perry was subsequently offered the position. (Docket No. 87, p. 5; Docket No. 111, p. 1.) Perry accepted the position and entered into three separate agreements with CEG on June 23, 2011: a Business Associate Agreement, a Physician Agreement, and a Medical Director Agreement.

Perry's tenure as Medical Director at Pine Ridge began in July 2011. The satisfaction ratings for the Emergency Department steadily increased under her supervision, but the improvements were not without complications. Perry testified that Carol McConn (McConn), Naples HMA's chief nursing officer, ignored her, excluded her from meetings, and bypassed her in communications. (Docket No. 90, pp. 30, 36.) Perry also stated that McConn rarely spoke with her, but routinely spoke with her predecessor and "any male physician present." (Id. at 30.)

Similarly, problems with Naples HMA nursing director Bobbie Hamilton (Hamilton) began on "day one." (Id.) Hamilton refused to discuss the business of the Emergency Department with Perry, ignored her as Medical Director, and "regularly exhibited a pattern of behavior consistent with harassment and being an obstructionist to [plaintiff's] role as Medical Director such as

3

failing to address clinical issues by Naples HMA RN's working with [her] and failing to communicate resolution of these concerns to [her]. She [also] refused to comply with requests for weekly meetings to ensure a collaborative approach to emergency department management." (Docket No. 90, p. 73; Docket No. 87-6, p. 16.)

On January 11, 2012, Perry sent an email to Hamilton and Dr. Todd Carlson (Carlson), TSG's Regional President-East Division, regarding the overtly negative attitude that nurse Aimee Collins (Collins) exhibited towards Perry. (Id. at 90.) Perry also stated that Naples HMA nurse Jacki Ellis (Ellis) treated her disrespectfully and unfairly by "lying in a medical record, refusing to be professional towards [her] in any manner, acting rude, confrontational and directly contradictory with regards to patient care. Ms. Ellis did not exhibit similar behavior towards other MD's." (Docket No. 87-4, p. 8.) Perry believed that the negative behavior exhibited by McConn, Hamilton, Collins, and Ellis was racially motivated.

In March 2012, Carlson and Marty Anderson (Anderson), a Senior Regional Vice President at TSG, had a meeting with Joseph Bernard (Bernard), the chief operating officer at Pine Ridge, McConn, and Kathleen Bove (Bove), Naples HMA's assistant chief nursing officer. During the meeting, McConn informed those present about issues respecting plaintiff's communications with

nurses, her alleged failure to complete mandatory chart reviews, and her alleged noncompliance with the Naples HMA sedation policy.   (Docket No. 89, p. 6; Docket No. 90, pp. 52-54.) Carlson, Anderson, and Bernard did not know of any issues regarding Perry's performance before this meeting.   (Docket No. 89, p. 4; Docket No. 110-1, p. 16; Docket No. 128, p. 36.)

On or about March 7, 2012, Perry had dinner with Carlson and Anderson to discuss the issues raised by McConn.   Perry indicated that the alleged deficiencies in her performance were false and that she would provide Carlson and Anderson with documentation to support her position.   Perry also agreed to provide Carlson and Anderson with an opportunity to address these issues with Naples HMA.   On March 21, 2012, Carlson sent Perry a text message stating that "We will be clearing the air and bringing the facts to light in front of all admin.   Will take care of it."   (Docket No. 87-8.)

On March 22, 2012, Perry told Anderson that she believed racial discrimination was an issue at Pine Ridge.   (Docket No. 90, p. 82.)   In response to the allegations of racial discrimination, Anderson sent Perry an email stating:

> I'm still bothered about your comments that Bobbie [Hamilton] has been making derogatory racial comments about you.   I know that you promised not to give us the names, but I really feel that it's necessary to bring this forward, it absolutely cannot be tolerated and I feel strongly and we need to have this investigated and handled.   Would you reconsider?

> There should be no threat to the parties that either
> heard the comments or were told the comments.   They
> would be protected.

(Docket No. 61-2, p. 19.)   However, Perry refused Anderson's

request, stating "Unfortunately, I am simply not in a position

to provide that specific info." (Id. at p. 18.)

On or about March 28, 2012, Bernard, COO of Pine Ridge,

requested TSG to remove Perry as Medical Director and staff

physician at Pine Ridge by invoking the contractual provision

permitting Naples HMA to remove a service provider for no cause

if it believed that the provider's services were not in Pine

Ridge's best interest.   Carlson and Anderson agreed to honor the

request and provided Perry with the sixty days' notice required

by the Physician Agreement and the Medical Director Agreement.

Perry worked at Pine Ridge until May 22, 2012.

## PROCEDURAL BACKGROUND

Perry initiated this action by filing a Complaint on

January 23, 2012.   (Docket No. 1.)   Perry is proceeding on her

Fourth Amended Complaint, filed August 25, 2013 against TSG,

CEG, Naples HMA, and Health Management Associates, Inc.[2]   (Docket

No. 61.)   In the Fourth Amended Complaint, Perry alleged claims

for racial discrimination under Title VII against TSG, CEG, and

---

[2] Health Management Associates, Inc. is a Michigan corporation
that was named as a party but was never served.   Perry has filed
a motion dismissing this entity as a defendant.   (Docket No
178.)

Naples HMA (Count I), gender discrimination under Title VII against TSG, CEG, and Naples HMA (Count II), racial discrimination under 42 U.S.C. § 1981 against TSG, CEG, and Naples HMA (Count III), retaliation under Title VII against TSG, CEG, and Naples HMA (Count IV), trade libel against Naples HMA (Count V), negligence against TSG and CEG (Count VI), breach of contract against TSG and CEG (Count VII), and breach of implied duty of good faith and fair dealing against TSG and CEG (Count VIII).

On August 29, 2013, TSG and CEG filed a Motion to Dismiss Counts VI, VII, and VIII (Docket No. 65), which was granted on March 13, 2014 (Docket No. 82). TSG and CEG thereafter filed a Motion for Summary Judgment on all remaining claims against them (Docket No. 87), which was granted on October 31, 2014 (Docket No. 160). After granting a request for reconsideration, the Court held that TSG and CEG were properly dismissed from the action. (Docket No. 169.)

Remaining before the Court are Perry's Title VII claims against Naples HMA (Counts I, II, and IV), Perry's racial discrimination claim under 42 U.S.C. § 1981 against Naples HMA (Count III), and Perry's trade libel claim against Naples HMA (Count V). Naples HMA has filed a Motion for Judgment as a Matter of Law (Docket No. 168) with respect to all outstanding claims, which the Court now considers.

## DISCUSSION

### I.   Legal Standard

Rule 50 provides that the Court may grant judgment as a matter of law if "a party has been fully heard on an issue . . . and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). When entertaining the motion, the "court must evaluate all the evidence, together with any logical inferences, in the light most favorable to the non-moving party." Beckwith v. City of Daytona Beach Shores, Fla., 58 F.3d 1554, 1560 (11th Cir. 1995). Under the Eleventh Circuit's "well established" standard, "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper." Lipphardt v. Durango Steakhouse of Brandon, Inc., 267 F.3d 1183, 1186 (11th Cir. 2001).

Under Rule 50(a)(2), "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." Fed. R. Civ. P. 50(a)(2). Here, the motion was made before a jury was even selected, and it was made after the time for filing a motion for summary judgment had expired. Naples HMA relies on the teaching of Greene v. Potter, 557 F.3d 765, 768 (7th Cir. 2009) to support its view that the motion under

8

Rule 50(a)(1) may be considered at this juncture in the case. In Greene, the district court granted a Rule 50 motion before the plaintiff had finished presenting evidence in her case-in-chief. In finding that to have been appropriate, the Seventh Circuit held that:

> Common practice may be to wait until a party has concluded her case-in-chief to ensure that she has been "fully heard" on the issue, but the Rule provides that "[a] motion for judgment as a matter of law may be made at any time before the case is submitted to the jury." It would be a foolish rule that guaranteed a party the right to present all of its evidence when the effort would clearly be futile. It is proper to enter judgment as a matter of law prior to the close of a plaintiff's case-in-chief so long as it has become apparent that the party cannot prove her case with the evidence already submitted or with that which she still plans to submit.

Id. at 768 (internal citations omitted).

At the Final Pretrial Conference in this case, counsel for Perry agreed that it was procedurally appropriate for the Court to entertain the Rule 50 motion before the trial because the recent grant of summary judgment in favor of TSG and CEG (Docket No. 160) had effected a legally significant change of circumstances by concluding that Perry was an independent contractor of TSG/CEG, not an employee.

That clearly is correct. Upon that agreement, and considering the text of Rule 50(a)(2) and the teaching of Greene, it is procedurally appropriate to entertain the Rule 50(a) motion at this point in the case.

## II.  Counts I, II & IV: Title VII

Title VII prohibits employers from discriminating against
"any individual" with respect to the terms and conditions of
employment "because of such individual's race, color, religion,
sex, or national origin."   42 U.S.C. § 2000e-2(a)(1).   As was
explained previously in granting summary judgment in favor of
TSG, "only those plaintiffs who are 'employees' may bring a
Title VII suit."   (Docket No. 160) (citing Llampallas v. Mini-
Circuits, Lab, Inc., 163 F.3d 1236, 1242 (11th Cir. 1998)).
That limitation is necessary to effectuate the intent of
Congress in enacting Title VII.   Llampallas, 163 F.3d at 1243.

Naples HMA contends that it is entitled to judgment as a
matter of law on Perry's race, gender, and retaliation claims
because of the earlier determination in this case that Perry was
an independent contractor under her contract with CEG, not an
employee, and because the record is clear that Perry has no
employment relationship with Naples HMA.   (Docket No. 160.)

For her part, Perry agrees that there is no employment
agreement between her and Naples HMA.   Nonetheless, she contends
that she can maintain her Title VII claims under either:   (1)
the "Indirect Theory of Liability" set forth in Sibley Memorial
Hospital v. Wilson; or (2) the "Joint Employer Doctrine."[3]   The

---

[3] At the Final Pretrial Conference held on November 6, 2014,

10

Court finds neither theory persuasive in this context and grants Naples HMA's motion with respect to Perry's Title VII claims.

### A. The **Sibley** Theory of Indirect Liability

In Sibley Memorial Hospital v. Wilson, 488 F.2d 1338 (D.C. Cir. 1973), the District of Columbia Circuit held that the protections of Title VII may reach "beyond the context of direct employment" where defendants "control access to such employment and . . . deny such access by reference to invidious criteria." 488 F.2d at 1342. The Eleventh Circuit has followed Sibley. See Zaklama v. Mt. Sinai Med. Ctr., 842 F.2d 291, 294 (11th Cir. 1988). Other courts have followed Sibley as well. See Doe v. St. Joseph's Hospital, 788 F.2d 411 (7th Cir. 1986); Gomez v. Alexian Bros. Hosp., 698 F.2d 1019 (9th Cir. 1983).

According to Perry, Sibley stands for the proposition that Title VII protects access to "job opportunities" generally, regardless of whether the plaintiff is an "employee" or the defendant is an "employer." (Docket No. 170.) The plaintiff reads Sibley and its progeny too broadly because the touchstone

---

Perry commented in passing that Naples HMA alone might be considered as Perry's employer based on the economic realities test. Her briefs do not offer such a contention, nor could such a contention be supported given the findings in the record respecting Perry's arrangement with TSG that were the foundation upon which TSG's motion for summary judgment was granted. Indeed, in making the passing comment at the conference, Perry pointed to nothing in the record that would support that notion. Therefore, the Court does not consider this suggestion to be properly briefed, or otherwise to be before it.

11

of Title VII is employment.  Although an employment relationship need not exist between the plaintiff and the defendant for Sibley to apply, it is the control of access to employment and a defendant's interference with an employment relationship or employment opportunity that forms the basis of an indirect liability claim under Sibley.  See Sibley, 488 F.2d at 1342 ("[R]elief . . . may be available, in an appropriate case, against respondents who are [not] direct employers of particular complainants, but who control access to *such employment* and who deny such access by reference to invidious criteria.") (emphasis added).  See also Zaklama, 842 F.2d at 295 ("Mt. Sinai was in a position to affect Zaklama's *employment* in the residency program and did affect his *employment* with its adverse evaluations") (emphasis added).

To further support her case, Perry also cites to Hunt v. State of Mo., Dep't of Corr., 119 F. Supp. 2d 996 (W.D. Mo. 2000), which also relies on Sibley.  However, Perry glosses over the dispositive fact that the plaintiffs in Hunt "clearly were employees at the time the alleged discrimination occurred" and "[n]either party dispute[d] this fact."  119 F. Supp. 2d at 1001.  Thus, Hunt does not advance Perry's case.

Here, Perry's service as the Medical Director of the Emergency Room at Pine Ridge was subject to the "continuous approval" of Naples HMA, which possessed the authority to

12

preclude any emergency professional from providing medical services if Naples HMA believed such services were not in its "best interest." (Docket No. 87-1, at 8.) If such a directive was made, TSG/CEG was contractually required to exclude Perry from providing any further services. (Id.) Although Naples HMA possessed the authority to control Perry's continued service with TSG/CEG, this Court has already determined that Perry stood in an independent contractor relationship – not an employment relationship – with TSG/CEG. (Docket No. 160.)

The importance of the employment relationship in this factual context is demonstrated by the differing outcomes in Gomez v. Alexian Bros. Hosp., 698 F.2d 1019 (9th Cir. 1983), which was cited by Perry (and which relies on Sibley) and Beverley v. Douglas, 591 F. Supp. 1321, 1328 (S.D.N.Y. 1984), which was cited by Naples HMA (and which distinguishes Sibley). In Gomez, the plaintiff-doctor was an employee of American Emergency Services ("AES"), which he owned and under which he practiced medicine. Gomez made a proposal to operate the defendant-hospital's emergency room on behalf of AES. After the hospital rejected the proposal, Gomez filed an action alleging a violation of his rights under Title VII.

The district court granted summary judgment to the hospital because "under the proposed contract AES would have been an independent contractor and plaintiff would have been an employee

13

of AES and not of the hospital." Gomez, 698 F.2d at 1020.   The

Ninth Circuit reversed, holding that, although "there must be

some connection with an employment relationship for Title VII

protections to apply, . . . the connection with employment need

not necessarily be direct." Gomez, 698 F.2d at 1021.   The Ninth

Circuit cited Lutcher v. Musicians Union Local 47, 633 F.2d 880,

883 (9th Cir. 1980), in which it had noted that the language of

Title VII "has been interpreted to encompass situations in which

'a defendant subject to Title VII interferes with an

individual's *employment* opportunities with another *employer*.'"

Id. (emphasis added).

By contrast, in Beverley, the plaintiff brought Title VII

claims against a hospital for denying her voluntary attending

physician's privileges thereby interfering with her job

opportunities.   The court noted that, "[e]ven assuming that

plaintiff has alleged that the Hospital's denial of her

application for voluntary attending privileges interfered with

her relationship to her patients, . . . plaintiff admits that .

. . a 'physician, in his or her relationship with patients, is

the classic independent contractor.'   In order to invoke Title

VII, plaintiff must allege and prove some link between the

defendants' actions and an employment relationship." Beverley,

591 F. Supp. at 1328.   In the absence of any interference with

14

an employment relationship, the court found that the hospital was entitled to summary judgment.

In this case, it has already been decided that Perry was an independent contractor — not an "employee" — of TSG/CEG. (Docket No. 160.)   Because there is no employment relationship with which to interfere, Perry's indirect liability claim under Title VII against Naples HMA predicated on Sibley and its progeny must fail.

### B. The Joint Employer Doctrine

Perry's response brief also contends that Naples HMA could be held liable as a "joint employer" with TSG/CEG.   (Docket No. 170.)    However, at the Final Pretrial Conference held on November 6, 2014, Perry conceded that her joint employee theory was not viable in light of the previous ruling that she was an independent contractor — not an employee — of TSG/CEG.    That concession was correctly made because where there is no employer in the picture at all, there can be no application of the joint employer doctrine.   See Virgo v. Riviera Beach Associates, Ltd., 30 F.3d 1350, 1360 (11th Cir. 1994) ("The basis of [a] finding [of joint employer liability] is simply that one employer while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer.") (citing NLRB v. Browning-Ferris

15

Industries, 691 F.2d 1117, 1122 (3d Cir. 1982)); Holyoke Visiting Nurses Association v. NLRB, 11 F.3d 302, 306 (1st Cir. 1993) ("A joint employer relationship exists where two or more employers exert significant control over the same employees and share or co-determine those matters governing essential terms and conditions of employment."). Where, as here, Perry is an independent contractor of TSG/CEG, it is not legally possible for Naples HMA to be a joint employer under the accepted contours of that doctrine.

## III. Count III: Section 1981 of the Civil Rights Act

Notwithstanding the failure of Perry's Title VII claims, she is not without recourse because Count III of the Fourth Amended Complaint, a claim under 42 U.S.C. § 1981, is not amenable to judgment as a matter of law. Under § 1981, "[a]ll persons within the jurisdiction of the United States" have the equal right to "make and enforce contracts" without respect to race. 42 U.S.C. § 1981(a). The statute defines "make and enforce" broadly to include "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). Although courts apply the same analysis to claims brought under Title VII and claims brought under § 1981, Phillips v. Aaron Rents, Inc., 262 F. App'x 202, 207 (11th Cir. 2008), the statutes protect

distinctly different relationships and thus the reach of Title
VII and § 1981 is not necessarily coextensive.  Compare Lyons v.
Kender, No. 2:08-CV-76-FTM-36DNF, 2010 WL 996511, at *2 (M.D.
Fla. Jan. 20, 2010) (holding that "the protections of Title VII
only extend to employees regarding employment relationships and
do not extend to independent contractors") with Webster v.
Fulton County, 283 F.3d 1254, 1257 (11th Cir. 2002) (holding
that "an independent contractor . . . [may state] a claim for
violation of Section 1981").  Employment may be the touchstone
of Title VII, but contracts are the touchstone of § 1981.

Here, Perry alleges that negative behavior exhibited
towards her at Pine Ridge was racially motivated.  Perry
testified that Wheelis said she may encounter problems at Pine
Ridge because of her race (Docket No. 90, p. 13), that other
employees at Naples HMA said Hamilton would try to "make your
life miserable" and hated Perry because of her race (Docket No.
90, pp. 68-69), and that nurses Ellis, Hamilton, and Collins
hated her and would challenge her role as director because she
was black (Docket No. 90, pp. 63-65).  Anderson also testified
that he believed the allegations brought by Naples HMA against
Perry (namely, Perry's alleged communication issues, her alleged
failure to complete mandatory chart reviews, and her alleged
noncompliance with the HMA sedation policy) were not true.
(Docket No. 134, p. 105.)  Perry alleges that these accusations

17

lodged by Hamilton were false, racially motivated, and formed the basis of Naples HMA's decision to request her termination. (Docket No. 110, pp. 19-20, 24.)

If racial animus indeed prompted Naples HMA to instruct TSG/CEG to terminate Perry's service as Medical Director of the Emergency Room at Pine Ridge, then this behavior would interfere with Perry's "performance" of her contract with TSG/CEG and her "enjoyment" of the contractual relationship under the language of § 1981. A number of circuits have held such "discriminatory interference with third-party contract" claims to be actionable. See Painter's Mill Grille, LLC v. Brown, 716 F.3d 342, 350-51 (4th Cir. 2013) (noting that if "defendants, with racial animus, interfered with Painter's Mill Grille's contract to sell the restaurant to the Hineses," the allegation would "probably state a claim" had the party not "affirmatively abandoned this basis for its § 1981 claim"); Faraca v. Clements, 506 F.2d 956, 959 (5th Cir. 1975) ("The courts in their broad interpretation of Section 1981 and 1982 . . . have held that a third party's interference with those rights guaranteed under Sections 1981 and 1982 will subject such a person to personal liability."); Muhammad v. Oliver, 547 F.3d 874, 878 (7th Cir. 2008) ("[T]ortious interference with contract rights violates section 1981 when the motivation for the interference is racial."); Harris v. Allstate Ins. Co., 300 F.3d 1183, 1197 (10th Cir.

18

2002) ("Relief is available under § 1981 where a party discriminatorily uses its authority to preclude an individual from securing a contract with a third party."). <u>See also</u> <u>Ginx, Inc. v. Soho Alliance</u>, 720 F. Supp. 2d 342, 358 (S.D.N.Y. 2010) (citing <u>Whidbee v. Garzarelli Food Specialties, Inc.</u>, 223 F.3d 62, 75 (2d Cir.2000)) ("[T]he United States Supreme Court ruled that 42 U.S.C. § 1982 protects against the actions of third parties, as well as the actions of an immediately contracting party. Several Circuits, including our own, have extended this principle to contract claims under § 1981.")

Under this line of authority, Perry's claim in Count III (that discriminatory interference with a third-party contract can form the basis of a § 1981 claim) is an available one. First, the claim falls within the plain language of the statute. The law provides a plaintiff the right to perform her contract and enjoy the "benefits, privileges, terms, and conditions" of her contractual relationship, without respect to race. <u>See</u> § 1981. Rather than designating specific actions by specific parties unlawful, the statute broadly grants all persons an equal right to make and enforce contracts and an ability to defend against incursions upon that right. When a third party violates the plaintiff's rights, § 1981 provides redress.

Second, the Supreme Court has held that "[t]he right to 'lease' is protected by § 1982 against the actions of third

19

parties," <u>Sullivan v. Little Hunting Park, Inc.</u>, 396 U.S. 229, 237 (1969), and the Supreme Court's "precedents have long construed §§ 1981 and 1982 similarly," <u>CBOCS W., Inc. v. Humphries</u>, 553 U.S. 442, 447 (2008). Just as "[a] narrow construction of the language of § 1982 would be quite inconsistent with the broad and sweeping nature of the protection meant to be afforded by § 1 of the Civil Rights Act of 1866 from which § 1982 was derived," <u>Sullivan</u> 396 U.S. at 237 (internal citation omitted), "[i]t would be logically inconsistent not to apply [this] interpretation with equal force to a suit for interference with the right to contract guaranteed by Section 1981 since . . . it is also derived from Section 1 of the Civil Rights Act of 1866 and thus should enjoy the same . . . breadth of coverage," <u>Faraca</u>, 506 F.2d at 959.

Lastly, that common sense and textually based interpretation of § 1981 permits the statute's protection to endure as shifts in the modern labor market increasingly operate to insulate traditional "employers" from liability. Naples HMA suggested at the Final Pretrial Conference that workers will remain protected by both Title VII and § 1981 to the extent that they functionally act as employees under the economic realities test. This hypothetical protection is cold comfort to individuals in Perry's position who would find themselves terminated on the basis of race without remedy under federal

law.  It is thus consistent with the broad protection envisioned by § 1981 to construe the statute to afford a remedy if a person in Perry's position is discriminated against by a third party and this discrimination interferes with the enjoyment of the benefits of her contractual relationship.

In its defense, Naples HMA relies on Domino's Pizza, Inc. v. McDonald, 546 U.S. 470 (2006) for the proposition that contractual privity is required to bring a cause of action under § 1981.  Naples HMA misreads Domino's, which is inapplicable to the facts of this case.  The lesson of Domino's is that "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship,' under which the plaintiff has rights."  546 U.S. at 476 (internal citation omitted). Perry has identified such a contractual relationship:  her Physician Agreement and Medical Director Agreement with TSG/CEG. Domino's protects Naples HMA from an argument that Perry is not making.  If Perry's § 1981 claim attacked the contract between Naples HMA and TSG/CEG, Domino's might preclude the claim because this Court has already determined that Perry did not have any rights under that contract. (Docket No. 82.)  However, Perry alleges that Naples HMA has interfered with her contract with TSG/CEG for discriminatory reasons.  Where the plaintiff possesses contractual rights of the sort Perry has here, Domino's is no bar.

In this case, it is undisputed that Naples HMA instructed TSG/CEG to terminate Perry's service as Medical Director of the Emergency Room at Pine Ridge, service that she enjoyed under her contract with TSG/CEG, and TSG/CEG was obligated to do so pursuant to its own contract with Naples HMA.[4]  If Perry can establish that her race was a motivating factor in Naples HMA's decision to instruct TSG/CEG to remove her from her position as Medical Director of the Emergency Room at Pine Ridge, Perry will succeed in her § 1981 claim.  Because the Court finds that the evidence presented creates a triable issue of fact on this point, Naples HMA's motion for judgment as a matter of law on Perry's § 1981 claim is denied.

## IV.  Count V: Trade Libel or Libel

The analysis of Count V begins with the observation that the pleadings and briefing on this claim have not been the model of clarity.  The Fourth Amended Complaint, the briefs, and the argument all have referred to Count V as presenting a "trade libel" claim.  However, the briefs and arguments have focused more on the components of the traditional tort of libel and

---

[4] In order to prevail on a claim of discriminatory interference with a third-party contract under § 1981, the plaintiff must demonstrate a causal link between the alleged interference and the resulting loss of a specific contract interest.  An attenuated connection will not suffice.  Cf. Harris v. Allstate Ins. Co., 300 F.3d 1183, 1197 (10th Cir. 2002).

often have used the term "defamation" to describe the claim presented in Count V.

The tort of "trade libel" (also known as injurious falsehood, slander of title, or disparagement of property), Salit v. Ruden, McClosky, Smith, Schuster & Russell, P.A., 742 So. 2d 381, 386 (Fla. Dist. Ct. App. 1999), is distinct from the tort of defamation, which encompasses written defamation (libel) and spoken defamation (slander), Klayman v. Judicial Watch, Inc., No. 13-20610-CIV, 2014 WL 2158418, at *4 n.2 (S.D. Fla. May 23, 2014). Trade libel is based on damage to one's property or economic relations and defamation is based on damage to one's reputation. See Salit, 742 So. 2d at 386, 389. Under either theory, however, Perry has failed to meet her burden and the Court grants Naples HMA's motion for judgment as a matter of law as to Count V.

### A. Trade Libel

Under Florida law, a plaintiff alleging trade libel must show: "(1) a falsehood; (2) has been published, or communicated to a third person; (3) when the defendant-publisher knows or reasonably should know that it will likely result in inducing others not to deal with the plaintiff; (4) in fact, the falsehood does play a material and substantial part in inducing others not to deal with the plaintiff; and (5) special damages are proximately caused as a result of the published falsehood."

Nat'l Numismatic Certification, LLC. v. eBay, Inc., No. 6:08-CV-42-ORL-19GJK, 2008 WL 2704404, at *18 (M.D. Fla. July 8, 2008) (punctuation altered).  Neither Perry nor Naples HMA has argued the elements of such a claim in their briefing.  (Docket No. 167; Docket No. 170.)  And, Perry neither pleads special damages, nor even argued that she has sustained them.  It is clear that "Florida law requires a trade libel plaintiff to prove special damages as part of his or her claim, and Rule 9(g) unequivocally states that '[i]f an item of special damage is claimed, it must be specifically stated.'"  Id. at *20.  Thus, if Count V truly was meant to present a trade libel claim, Naples HMA is entitled to judgment as a matter of law on it.

### B. Libel

However, from the allegations of the Complaint and the parties' briefing and argument, it appears that Count V proceeds on the theory that McConn's statements in the early March 2012 meeting with TSG representatives Carlson and Anderson constituted "libel" in its traditional form.  The Fourth Amended Complaint alleges that the statements constitute "libel per se." (Docket No. 61, ¶ 155.)  Under Florida law, a plaintiff alleging libel (or slander) must demonstrate that:  (1) the defendant published a false statement; (2) about the plaintiff; (3) to a third party; and (4) the party suffered damages as a result of the publication.  Thompson v. Orange Lake Country Club, Inc.,

224 F. Supp. 2d 1368, 1376 (M.D. Fla. 2002). And, "a publication is libelous per se when it imputes to another . . . conduct, characteristics, or conditions incompatible with the proper exercise of one's lawful business, trade, profession, or office." Madsen v. Buie, 454 So. 2d 727, 729-30 (Fla. Dist. Ct. App. 1984). In such a case, the publication "necessarily imports injury, and thereby obviates the necessity of either pleading or proving damage or malice in fact, since both of these elements are presumed as a matter of law in such cases." Layne v. Tribune Co., 108 Fla. 177, 181, 146 So. 234, 236 (1933).

In its motion, Naples HMA argues that: (1) Perry has failed to allege the existence of a written publication of a false statement; and (2) Naples HMA possessed a conditional privilege to make the statements at issue. (Docket No. 167.) Assuming without deciding that the statements at issue constitute libel per se, Count V nonetheless fails.

### 1. The Writing Issue

Libel is defined as "the unprivileged written publication of false statements." Thompson, 224 F. Supp. 2d at 1381. Where the plaintiff cannot establish that any defamatory statement was made in writing, the plaintiff has failed to satisfy an element of the libel claim. Id. Although Florida recognizes the more general "tort of defamation", Jews For Jesus, Inc. v. Rapp, 997

So. 2d 1098, 1106 (Fla. 2008), Perry has specifically alleged "libel," and yet has failed to provide any example of a defamatory writing. (Docket No. 167; Docket No. 170.)

Instead, in her brief and at argument on the motion, Perry took the view that Florida law does not require a writing, relying upon <u>Madsen</u> for the rule that "[a]ny publication, oral or written, which imputes to another a condition incompatible with the proper exercise of his trade or profession, amounts to a slander or libel per se." 454 So. 2d at 729. Rather than buttressing Perry's argument, that formulation actually lends further support to the position taken by Naples HMA.[5] The fact that an "oral or written" publication amounts to "slander or libel" shows that the two defamation torts are related and differ only to the extent that the defamation is "published" in oral or written form. The rule is stated with the differentiating elements respectively ordered. Although these elements may be interchangeable in a broad discussion of the general term "tort of defamation," Perry cannot allege "libel" on the basis of a spoken defamation or "slander" on the basis of a written defamation, lest the distinction between these claims lose all meaning whatsoever. And, <u>Madsen</u> teaches that there is a meaningful distinction.

---

[5] The facts of the case lend support to Naples HMA as well. In <u>Madsen</u>, the allegedly libelous statement came in the form of a letter.

### 2. Privilege

Even assuming that Perry had correctly pleaded slander per se rather than trade libel (a different tort) or libel per se (which requires a writing), Perry's claim would still yield to Naples HMA's contention that "to the extent any statements were exchanged . . . those statements are conditionally privileged." (Docket No. 167.)  "One who publishes defamatory matter concerning another is not liable for the publication if (a) the matter is published upon an occasion that makes it conditionally privileged and (b) the privilege is not abused."  Nodar v. Galbreath, 462 So. 2d 803, 809 (Fla. 1984).  Here, Naples HMA possessed a conditional privilege as a matter of law and Perry has failed to demonstrate that this privilege was abused.

### i. Existence of Conditional Privilege

Naples HMA rightly asserts that "[a] communication made in good faith on any subject matter by one having an interest therein, or in reference to which he had a duty, is privileged if made to a person having a corresponding interest or duty, even though it contains matter which would otherwise be actionable, and though the duty is not a legal one but only a moral or social obligation." American Airlines, Inc. v. Geddes, 960 So.2d 830, 833 (Fla. 3rd DCA 2007).  See also Nodar v. Galbreath, 462 So. 2d 803, 809 (Fla. 1984).  Under the common law of Florida, for example, "a communication to an employer

27

regarding his employee's performance is conditionally privileged, and the mode, manner, or purpose of the communication would go to the question of abuse or forfeiture of the privilege. Analogous situations include communications for bona fide commercial purposes where the interest to be protected is the recipient's." Nodar, 462 So. 2d at 809.

Perry does not dispute that Naples HMA and TSG possessed mutual interests or that the statements had a bona fide commercial purpose in TSG's interest. Rather, she asserts that "whether such a privilege existed is a fact issue for the jury." (Docket No. 170.) Perry misunderstands the law and misinterprets the cases cited in support of her position. As the Supreme Court of Florida explained in Abraham v. Baldwin:

> In determining whether or not a communication is privileged, the nature of the subject, the right, duty, or interest of the parties in such subject, the time, place, and circumstances of the occasion, and the manner, character, and extent of the communication, should all be considered. *When all these facts and circumstances are conceded*, a *court* may decide whether a communication is a privileged one, so as to require the plaintiff to prove express malice. But, *when all the essential facts and circumstances are not conceded*, the existence or nonexistence of the privilege should be determined by the *jury* from all the facts and circumstances of the case, under proper instructions of the court applicable to the case.

42 So. 591, 592 (Fla. 1906) (emphasis added). In the case cited by Perry, "many of the facts and circumstances relevant to the qualified privilege defense were not conceded below" and

"[t]hus, . . . a qualified privilege did not exist as a matter of law." Schreidell v. Shoter, 500 So. 2d 228, 231 (Fla. Dist. Ct. App. 1986). Unlike in Schreidell, no facts relevant to the privilege determination are disputed. Both parties agree that McConn made negative statements regarding Perry's job performance and accepting Perry's characterization of these statements would have no effect on whether they were privileged.

Naples HMA has shown that the statements made by McConn about Perry's work performance were shared in the mutual interest of TSG and Naples HMA. Perry has not shown that there are facts from which a reasonable jury would find otherwise. Because the statements were made at a private meeting about a subject of mutual commercial interest to the parties involved in the discussions and the extent of the communications were limited to a small number of company representatives also directly involved in the oversight of Perry's work, the record shows that Naples HMA possessed a conditional privilege to share the statements with TSG.

## ii. Express Malice

Once a conditional privilege has been established, the privilege "eliminates the presumption of malice attaching to defamatory statements by law," "raises a presumption of good faith[,] and places upon the plaintiff the burden of proving express malice." Nodar, 462 So. 2d at 810. Although Perry argues that the question of "good motive" is one for the jury (Docket No. 170), she overlooks the fact that the burden now rests with her to establish "express malice."

In order to eliminate the presumption of good faith, Perry must show that the "primary motive for the statement" was "an intention to injure the plaintiff." Id. at 806. In other words, the purpose for the privilege must be displaced by a showing that "the speaker is motivated *more by* a desire to harm the person defamed than by . . . [the] interest giving rise to the privilege." Id. at 811 (emphasis added). Moreover, "[e]xpress malice cannot be inferred from the mere fact that the statements were untrue." Coogler v. Rhodes, 21 So. 109, 112 (Fla. 1897). Even if McConn "acted in disregard of whether the statements were false[,] . . . [t]his element goes to actual malice, not express malice." John Hancock Mut. Life Ins. Co. v. Zalay, 581 So. 2d 178, 180 (Fla. Dist. Ct. App. 1991). Finally, even if the defamer "in fact feels hostility or ill will toward the plaintiff," this will not destroy the privilege unless the

*primary* motivation for the statement is to harm the plaintiff. Nodar, 462 So. 2d at 812.

Here, the question is not solely whether McConn disliked Perry, whether the statements were false, or whether McConn conducted an investigation into the veracity of the accusations. The burden is upon Perry to show facts from which a jury could find that McConn's primary purpose in relaying Hamilton's complaints was to injure Perry. Perry has not satisfied that burden. In fact, she has failed to make any such argument in opposing the motion for judgment as a matter of law. In the absence of any showing that a jury could find express malice, the conditional privilege stands as a bar to a defamation claim.

CONCLUSION

For the foregoing reasons, DEFENDANT NAPLES HMA, LLC'S RULE 50 MOTION FOR JUDGMENT AS A MATTER OF LAW (Docket No. 168) is granted as to Counts I, II, IV and V of the Fourth Amended Complaint (Docket No. 61) and is denied as to Count III of the Fourth Amended Complaint (Docket No. 61).

It is so ORDERED.

/s/   REP
_____
Robert E. Payne
Senior United States District Judge

Date: November 19, 2014